UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x

MICHAEL SABELLA,                                    Docket No.:
                                                    06 – CV – 6566 (NG)(SMG)
                        Plaintiff,

        v.

AMERICAN STEVEDORING, INC., and
LOCAL 1814 INTERNATIONAL
LONGSHOREMAN'S ASSOCIATION, AFL-CIO,

                        Defendants.

-------------------------------------------------------------------x


## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION PURSUANT TO RULES 50 & 59 OF THE FEDERAL RULES OF CIVIL PROCEDURE AGAINST DEFENDANT LOCAL 1814


LEVINE & BLIT, PLLC
*Attorneys for Plaintiff*

Empire State Building
350 Fifth Avenue, 36th Floor
New York, New York 10118
Phone: (212)967-3000
Fax: (212)967-3010

**TABLE OF CONTENTS**

I.    PRELIMINARY STATEMENT                                        1

II.   STATEMENT OF FACTS                                          2

III.  PROCEDURAL HISTORY                                          4

IV.   LEGAL ARGUMENT                                              5

      A.    A Reasonable Jury Would Have Concluded that the Union Breached
            Its Duty of Fair Representation to Sabella and Caused Economic
            Harm to Sabella                                       5

            1.    Legal Standard for Judgment as a Matter of Law Pursuant to
                  F.R.C.P. Rule 50(b)                             5

            2.    The Overwhelming Evidence Elicited at Trial Demonstrates
                  that the Union Breached Its Duty of Fair Representation to
                  Sabella                                         6

            3.    The Overwhelming Evidence Elicited at Trial Demonstrates
                  that the Union's Breach of Duty Caused Sabella to Suffer
                  Economic Loss of $114,000, or No Less Than $24,000      18

                  a.    Plaintiff Immediately Suffered Damages, and Immediately
                        Took Steps to Mitigate his Damages        18

                  b.    Plaintiff's Separation from NYCT Was Not For Cause, and
                        Was Against the Industry's Collective Bargaining
                        Agreement                                 21

                  c.    Plaintiff Further Mitigated his Damages By Calling In for
                        Work   Hundreds of Times in Which He Was Not Offered
                        Any Work                                  23

            4.    Alternatively, or Conditionally, the Court Should Order a New
                  Trial Pursuant to F.R.C.P. Rules 50(b), 50(c)
                  and 59                                          25

                  a.    Legal Standard for Granting a New Trial   25

b.   The Jury's Finding against Sabella on the Duty of Fair
Representation Claim Was against the Weight of the
Evidence                                              26

V.   CONCLUSION                                            26

## TABLE OF AUTHORITIES

**Cases**                                                                      **Page(s)**

*DePascale v. Sylvania Electric Products, Inc.,*
710 F. Supp. 2d 275, 279 (E.D.N.Y. 2010)                    5, 6, 17, 25, 26

*Diesel v. Town of Lewisboro,*
232 F.3d 92, 103 (2d Cir. 2000)                                    6, 17

*Farrior v. Waterford Bd. of Educ.,*
277 F.3d 633, 635 (2d Cir. 2002)                                   26

*Galdieri-Ambrosini v. National Realty & Dev. Corp.,*
136 F.3d 276, 289 (2d. Cir. 1998)                                  5

*Green v. Groneman,*
634 F. Supp.2d 274, 284 (E.D.N.Y. 2009)                           5

*LeBlanc-Sternberg v. Fletcher,*
67 F.3d 412, 429 (2d Cir. 1995)                                    6

*Thurman v. Yellow Freight Systems, Inc.,*
90 F.3d 1160, 1168                                                 21

## I.  **PRELIMINARY STATEMENT**

Plaintiff Michael Sabella ("Sabella" or "plaintiff") hereby respectfully submits his Memorandum of Law in Support of Sabella's Motion for Judgment as a Matter of Law against defendant Local 1814 International Longshoremen's Association, AFL-CIO ("Local 1814") pursuant to Rule 50(b) of the Federal Rules of Civil Procedure ("F.R.C.P"); and/or, alternatively or conditionally, Motion for a New Trial against Local 1814 pursuant to Rules 50(b), 50(c), and 59 of the F.R.C.P.  At trial, Local 1814 failed to offer any evidence to show that it had represented Sabella's interests fairly, in a non-arbitrary or non-discriminatory manner, concerning his suspension and termination from American Stevedoring, Inc. ("ASI").  In fact, the President of Local 1814, Lou Pernice ("Pernice"), who was charged with representing Sabella's interests, testified that he had recommended termination during a meeting with ASI and the labor adjusters outside of the pier level hearing, which went directly against Sabella's interests in remaining employed by ASI.  Further, Pernice testified that at the pier level hearing, which would determine Sabella's fate, he presented no evidence or no witnesses and ordered Sabella not to participate in his defense, when such evidence was available and would have demonstrated that termination was an extreme and unjustified action under the circumstances and under the terms of the Collective Bargaining Agreement.  Further, Local 1814 submitted evidence, through attendance business records maintained by the New York Shipping Association ("NYSA"), that demonstrated that Sabella attempted to obtain work subsequent to his termination from ASI, but was denied work on hundreds of occasions.  Moreover, the witnesses called by Local 1814, Pernice and Frank Agosta ("Agosta"), confirmed that Sabella's termination from the New York Container Terminal

[1]

in January 2007 for leaving work early on a single occasion was unprecedented and contrary to the industry's policies calling for progressive discipline for absenteeism. For these reasons and others further discussed herein, plaintiff respectfully requests that this Court grant his motion for judgment as a matter of law and/or, alternatively or conditionally, his motion for a new trial.

## II.   **STATEMENT OF FACTS**

For the Court's reference, only facts relevant to the instant motion are articulated herein.

Plaintiff was employed by defendant ASI from on or about 2002 to November 2006. (Exhibit A, p4:10-12)[1] At all times relevant to this action, plaintiff was a union member of defendant Local 1814 (Exhibit A,p 4:12-15), whose President was Pernice and Representative was Agosta.

On May 2, 2006, plaintiff filed an EEOC Charge against defendant ASI, alleging sexual harassment, discrimination and retaliation. (Exhibit A, p18:11-15; Exhibit B[2]) Soon thereafter, a frivolous complaint of discrimination and retaliation was filed against plaintiff by Nicola Vitale ("Vitale"), though plaintiff and Vitale were the same race, religion and national origin, and though Vitale had never before engaged in a protected activity, which would warrant a retaliation claim.

---

[1] For all citations to (Exhibit A, pX:X-X), please see the trial transcript of the testimony of Michael Sabella on November 10, 2014, attached to the Affirmation of Matthew J. Blit in Support of Plaintiff's Motion, as Exhibit 'A'.
[2] For all citations to Exhibit B, please see the EEOC Charge of Discrimination by Michael Sabella against ASI, attached to the Affirmation of Matthew J. Blit in Support of Plaintiff's Motion, as Exhibit 'B'

On July 20, 2006, plaintiff filed a second EEOC Charge, this time against his union, defendant Local 1814. (Exhibit C)[3]   Soon thereafter, a biased and pretextual investigation was launched against plaintiff by Albert Feliu ("Feliu"), the industry EEO officer representing both the employers and unions. (Exhibit D, pp40-41:7-19)[4]  Notably, though Feliu was the industry's EEO officer, he took no steps to investigate plaintiff's claims of discrimination against ASI and Local 1814 (Exhibit D, 11/14/14, pp42-43:2-6), but spent a month investigating Vitale's frivolous complaint against plaintiff, though plaintiff and Vitale were the same race, religion and national origin, and though Vitale had never before engaged in a protected activity, which would warrant any retaliation claim.

Defendant Local 1814 provided no assistance to plaintiff during the Feliu investigation of plaintiff. (Exhibit D, 11/14/14, p39-40:24-6)   Soon thereafter, ASI permanently suspended plaintiff in retaliation for plaintiff's complaint of discrimination against ASI, effectively ending plaintiff's employment with the company.

Plaintiff filed a grievance with Local 1814 in response to ASI's permanent ban. (Exhibit A, 11/10/14, p25:6-7) Local 1814 took no action to represent plaintiff at any time during the grievance process, up to, and through, the Pier Level Hearing held to hear the grievance. (Exhibit A, 11/10/14, pp25-27:17-3)

An indisputable conflict of interest existed between plaintiff and Local 1814 when Pernice was purportedly representing plaintiff through his grievance with ASI.  This conflict of interest stemmed from the fact that plaintiff had an outstanding EEOC Charge

---

[3] For all citations to Exhibit C, please see the EEOC Charge of Discrimination by Michael Sabella against Local 1814, attached to the Affirmation of Matthew J. Blit in Support of Plaintiff's Motion, as Exhibit 'C'
[4] For all citations to (Exhibit D, pX:X-X), please see the trial transcript of the testimony of Alfred Felieu, on November 14, 2014, attached to the Affirmation of Matthew J. Blit in Support of Plaintiff's Motion, as Exhibit 'D'.

of discrimination filed against the union when Pernice was purportedly providing such representation. Though Pernice owed Plaintiff a duty of fair representation, Pernice unilaterally, and without any legitimate basis, determined and recommended that plaintiff should be suspended permanently from ASI. (Exhibit E, pp241-242:7-12)[5] Pernice's determination, against the interests of his own Union member, could reasonably be inferred to being due to the conflict of interest. Further, at the Pier Level hearing, Pernice conspired with management to actually cause plaintiff to be suspended and banned from ASI permanently. (Exhibit E, 11/18/14, pp251-    252:23-10)

Immediately thereafter, and through at least 2010, plaintiff took steps to mitigate his damages resulting from his retaliatory termination from ASI, and from Local 1814's failure to fairly represent him while grieving such termination.   Plaintiff suffered significant economic loss due to the union's breach of its duty.

## III.   **RELEVANT PROCEDURAL HISTORY**

In the instant civil action, trial commenced on November 10, 2014 and continued until November 21, 2014, when the jury returned its verdict after approximately two days of deliberations.  Sabella brought a single cause of action against Local 1814, the breach of the duty of fair representation.  Against ASI, Sabella brought causes of action for (a) hostile work environment harassment based upon sex and (b) retaliation.  When Local 1814 rested its case and prior to the case being submitted to the jury, Sabella moved for judgment as a matter of law pursuant to F.R.C.P. Rule 50(a) against Local 1814 on his cause of action for the breach of the duty of fair representation.  The Court deferred its

---

[5] For all citations to (Exhibit E, pX:X-X), please see the trial transcript of the testimony of Loius Pernice on November 18, 2014, attached to the Affirmation of Matthew J. Blit in Support of Plaintiff's Motion, as Exhibit 'E'.

[4]

decision. In its verdict, the jury found that Sabella had not proven by a preponderance of

the evidence that Local 1814 had breached its duty of fair representation 'and, as a result,

the jury did not reach the question of whether Local 1814 was jointly or severally liable

for Sabella's economic loss. In addition, the jury found that Sabella had not proven any

economic loss. The jury returned a verdict in favor of Sabella against ASI on the

retaliation cause of action, awarding $60,000.00 in punitive damages. There was a hung

jury on Sabella's cause of action for hostile work environment harassment based upon

sex and the Court declared a mistrial. Sabella now bring his instant motion, renewing his

motion against Local 1814 brought at trial.

## IV.     ARGUMENT

### A.     A Reasonable Jury Would Have Concluded that the Union Breached Its Duty of Fair Representation to Sabella and Caused Economic Harm to Sabella

#### 1.     Legal Standard for Judgment as a Matter of Law Pursuant to F.R.C.P. Rule 50(b)

"Rule 50 of the Federal Rules of Civil Procedure provides for entry of judgment

as a matter of law where, a reasonable jury would not have a legally sufficient evidentiary

basis to find in favor of the non-moving party as to the claim at issue." *DePascale v.*

*Sylvania Electric Products, Inc.*, 710 F. Supp. 2d 275, 279 (E.D.N.Y. 2010) (internal

quotation marks omitted). "The motion is properly granted only if 'the evidence, viewed

in the light most favorable to the opposing party, is insufficient to permit a reasonable

juror to find' in that party's favor." *Id.* (quoting *Galdieri-Ambrosini v. National Realty &*

*Dev. Corp.*, 136 F.3d 276, 289 (2d. Cir. 1998), and *Green v. Groneman*, 634 F. Supp.2d

274, 284 (E.D.N.Y. 2009)). "The court is required to consider the evidence in the light

most favorable to the party against whom the motion is made, and to give that party the

benefit of all reasonable inferences that the jury might have drawn in that party's favor from the evidence. The court cannot assess the weight of the evidence, pass on the credibility of the witnesses, or substitute its judgment for that of the jury." *DePascale*, 710 F. Supp. 2d at 279 (citing *LeBlanc-Sternberg v. Fletcher*, 67 F.3d 412, 429 (2d Cir. 1995)). As such, "[a] motion for judgment as a matter of law can only be properly granted where, 'there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or such an overwhelming amount of evidence in favor of the movant that reasonably and fair minded men could not arrive at a verdict' against the movant." *DePascale*, 710 F. Supp. 2d at 279 (quoting *Diesel v. Town of Lewisboro*, 232 F.3d 92, 103 (2d Cir. 2000)).

## 2.   The Overwhelming Evidence Elicited at Trial Demonstrates that the Union Breached Its Duty of Fair Representation to Sabella

Subsequent to ASI's retaliatory permanent suspension of plaintiff, plaintiff filed a grievance in response to ASI's adverse employment action, thus turning to Local 1814 to assist him to regain his employment. The evidence that ASI's adverse employment action against plaintiff was retaliatory and unlawful was easily ascertainable with any degree of effort.   It was Defendant Local 1814's duties to uncover and present evidence in support of plaintiff on plaintiff's behalf, or at least make a good faith effort to try and do so. Local 1814, as plaintiff's union, had a duty to fairly represent plaintiff, and to show that the adverse employment action taken against him was unwarranted.

Had Local 1814 fulfilled its duty, plaintiff would have been returned to steady employment at ASI, his home pier where he was guaranteed steady work above most

[6]

others.   In providing fair representation to plaintiff, logic dictates that Local 1814 should

have, at the very least:

- Conducted an investigation on plaintiff's behalf, which should have included speaking to witnesses who supported plaintiff's claims;

- Represented plaintiff during the Feliu investigation, as unions have done previously during prior investigations by Feliu;

- Critically reviewed and analyzed the Feliu report, and its massive shortcomings;

- Gathered witnesses for plaintiff, of which there were several, to testify for plaintiff at plaintiff's Pier Level Hearing regarding ASI's suspension;

- Gathered evidence for plaintiff, to be used on plaintiff's behalf, at the Pier Level Hearing;

- Met with plaintiff at any time prior to the Pier Level Hearing to prepare him for the hearing and listen to the evidence he had against suspension;

- Made at least some basic argument against permanent suspension at the Pier Level Hearing;

- Allowed plaintiff to make arguments on his behalf at the Pier Level Hearing;

- Argue for a less severe penalty than permanent suspension; and,

- Very importantly, point out conflicts of interest to plaintiff, regarding Local 1814's representation of plaintiff subsequent to plaintiff filing an EEOC Charge of discrimination against Local 1814.

This is the very least that Local 1814 should have done, as plaintiff's representative.

Though the union had a duty to fairly represent plaintiff, the union attempted not one of

these very basic actions in its representation of plaintiff.

   The jury was presented with the following testimony and evidence proving that

Local 1814 took none of these very basic actions on plaintiff's behalf, and also proving

that Local 1814 actually conspired with management to uphold plaintiff's suspension.

[7]

Specifically, plaintiff testified that Local 1814 'did nothing' whatsoever to defend him initially against Vitale's frivolous claims:

> Q.          To the best of your knowledge, what if anything did the union representative do to defend you against Mr. Vitale's claims?
>
> SABELLA:    Me?  They did nothing. (Exhibit A, p24-25:25-3)

Though a duty to represent plaintiff existed, Local 1814 intentionally refused to involve itself in this matter on plaintiff's behalf.

Further, throughout the Feliu investigation, Local 1814 provided no representation to plaintiff during the investigation, though he was being investigation for a claim that would ultimately cause him to lose his employment:

> Q.          What if any type of union [representation] did you have with these interactions with Mr. Feliu?
>
> Sabella.    It was just me and Feliu. (Exhibit A, p24:17-19)

The union certainly could have interjected itself into the Feliu investigation in support of plaintiff.  Feliu, himself, admitted that, in the past, unions have provided representation to targets of his investigation:

> Q.          Okay. So in the past has union representation been available or present during these meetings with you?
>
> Feliu.      Yes.
>
> Q.          But not in this situation?
>
> Feliu.      Not in this situation. (Exhibit D, p.40:2-6)

[8]

Again, Local 1814 was entirely absent from the interrogation and investigation of plaintiff by Feliu, though it had a duty to the contrary.

As discussed, subsequent to the issuance of the Feliu report, plaintiff was effectively terminated from ASI, in retaliation for his prior protected complaints of discrimination.  Though plaintiff filed a grievance to Local 1814 regarding this effective termination, the record shows that Local 1814 did absolutely nothing to provide fair representation to plaintiff during this grievance process.

A Pier Level Hearing was held in May of 2007, regarding plaintiff's grievance of his separation from ASI. (Exhibit A, p25:17-20)  At trial, plaintiff testified that, had proper representation been provided to him by his union, he could have shown, among other things: that the Vitale complaint against plaintiff was actually in retaliation by Vitale for plaintiff filing a Waterfront Police complaint against Vitale; that witnesses, such as David Morales and Willie Pagan, could have supported plaintiff's position that he was wrongfully terminated by ASI (but Local 1814 would not allow the three in the room together); and, that he had filed an EEOC Charge of discrimination against ASI soon before his investigation and termination, thus giving ASI a retaliatory motive for his termination. (Exhibit F, pp16-17:22-21)[6]   All of these issues would have supported plaintiff's efforts to be reinstated at ASI.

Instead, at plaintiff's Pier Level Hearing Local 1814 provided *no representation whatsoever* on behalf of plaintiff.  Notably, this fact is undisputed.

---

[6] For all citations to (Exhibit F, pX:X-X), please see the trial transcript of the testimony of Michael Sabella on November 12, 2014, attached to the Affirmation of Matthew J. Blit in Support of Plaintiff's Motion, as Exhibit 'F'.

Q.          You testified on Monday a little bit about what happened at this
            peer level meeting.  What evidence if any that you had at the time
            do you believe would have changed the result of that Pier Level
            Hearing? (Exhibit F, p16:22-25)

SABELLA.    ...I had no representation.  I wasn't – when I tried to say
            something, I was told to shut up and sit down.

Q.          By who?

SABELLA.    Lou Pernice (President of Local 1814).  And I said things, but I
            couldn't like get to the point, because it was, "Sit down, Sabella.
            Sit down, Sabellla.  Shut up and sit down."

            But they weren't defending me.  All I had to do is try to do it on
            my own, and they weren't doing anything.  What they were saying
            accusations, this, that, that, and I couldn't do anything.

            And they had all the big shots from the union and the New York
            Shipping were there.  And I was basically alone and I couldn't say
            anything and nothing was offered in my defense, no documents,
            nothing.

            I think if I would have had representation, if it was fair, they would
            have – there's so many things.  I would have never lose my job,
            never.  It's impossible, impossible. (Exhibit F, pp17-18:25-17)

It was not only inadequate representation of Mr. Sabella by his union, but a
complete lack of any representation whatsoever.  In addition to providing no arguments
on Mr. Sabella's behalf at the Pier Level Hearing, Local 1814 offered no evidence
whatsoever on his behalf. (Exhibit A, p26:20-21)

The record shows that plaintiff's testimony regarding Local 1814's complete
failure to provide him any representation during this critical hearing process was
uncontroverted and, in fact, wholly supported by Local 1814, itself.

Pernice readily admitted that he, as President of Local 1814, owed plaintiff a duty
of fair representation:

[10]

> Q.        And when I say "representation", you would agree that every
>           single union member, including Mr. Sabella, was entitled to fair
>           representation, correct?
>
> PERNICE.  Yes. (Exhibit E, p.222:15-18)

However, Pernice's very own testimony is in agreement with Mr. Sabella's testimony, as it shows that no such representation by the union was ever provided. Pernice readily admits that, at the Pier Level hearing, he told plaintiff to 'sit down' and 'shut up':

> Q.        You told him to shut up and sit down, right?
>
> PERNICE.  Right.  I guess I did.  That's what shows on the record. (Exhibit E,
>           p.214:14-15)

Further, at trial Pernice recalled not a single argument presented by the union at the Pier Level Hearing on plaintiff's behalf:

> Q.        In fact, at the Pier Level Meeting in '07 concerning his suspension,
>           you didn't offer a single argument on his behalf, isn't that correct?
>
> PERNICE.  I'm not sure. (Exhibit E, p.223:2-5)

Further,

> Q.        Going to your deposition…"What argument did you make on
>           behalf of Mr. Sabella, if any, at his Pier Level meeting in the
>           Spring of 2007 concerning his suspension?"
>
>           "Spring of 2007, he was present at the meeting.  Discussions were
>           had.  There were no arguments on his part, no issues that were

raised by him to me to present before the committee.  So the answer to that is no."

Do you recall giving that testimony?

PERNICE.     Yes. (Exhibit E, p.228:3-25)


Not only did Local 1814 not present a single argument on plaintiff's behalf, but also refused to call a single witness on plaintiff's behalf.  Agosta, Pernice's subordinate at Local 1814, reluctantly confirmed that there were longshoremen who supported plaintiff's contentions with regard to his termination from ASI, but testified that those who supported plaintiff were not called to testify at plaintiff's Pier Level Hearing:


Q.          Let me ask you this.  Isn't it true that there were longshoremen that supported Mr. Sabella's position?

AGOSTA.     Not that I was aware of.

Q.          You're not aware of Mr. Pagan?

AGOSTA.     Yes, I am.

Q.          Did he testify at Mr. Sabella's hearing?

AGOSTA.     No.

Q.          You are aware that Mr. Morales supported Mr. Sabella, aren't you?

AGOSTA.     Yes.

Q.          Mr. Pernice was aware of this also, right?

AGOSTA.     Yes.

Q.          But he wasn't called to testify on Mr. Sabella's behalf at this hearing, was he?

[12]

AGOSTA.    Not that I recall. (Exhibit E, pp359-9:12-1)

As plaintiff testified at trial, Local 1814 provided no representation for him at, or prior to, his Pier Level Hearing, which was his only opportunity to fight ASI for terminating him in retaliation for his protected complaint. Testimony from the union's witnesses confirms this, and further confirm that no preparation was made by the union prior to the hearing to provide plaintiff with a defense:

Q.        Did you ever meet with Mr. Sabella to discuss his arguments for the pier level meeting?

PERNICE.    ...I don't recall that I did. (Exhibit E, p.232:6-13)

In sum, Local 1814: made no investigation of the Vitale complaint against plaintiff; provided no assistance to plaintiff during the Feliu investigation against him; did not prepare in any respect for plaintiff's Pier Level hearing; provided no witnesses, evidence or arguments in support of plaintiff during his Pier Level Hearing; and, interrupted and scolded plaintiff for trying to argue on behalf of himself during plaintiff's Pier Level hearing.

Though it is unlawful, it makes sense that Local 1814 outright refused to represent plaintiff in any respect during his grievance of his retaliatory termination from ASI. After all, only weeks before the Feliu investigation commenced, plaintiff filed an EEOC Charge of discrimination and retaliation against *Local 1814*. (Exhibit C)

Q.        And you would agree that the pier level meeting was subsequent to the date of the EEOC charge that Mr. Sabella brought against the union, correct?

[13]

PERNICE.   What is the date on that charge, July?

Q.         Your attorney just agreed that it was July 20th, 2006.

PERNICE.   Ok.

Q.         Okay.  So we're in agreement on that?

PERNICE.   And that pier level meeting was May.  So the pier level meeting took place in May of 2007.

Q.         Right.  After the EEOC charge, correct?

PERNICE.   Yes, that seems correct. (Exhibit E, pp.236-7:18-3)

Clearly, a conflict of interest existed, as Local 1814 was tasked to represent a person who recently brought charges against the union itself.  This conflict of interest leads to another failure on the part of Local 1814 to provide fair representation to plaintiff.

As this conflict of interest between plaintiff and Local 1814 existed from July of 2006 going forward, it is reasonable that the union had a duty to provide independent representation for plaintiff from the time of the Feliu report onward, or at least discuss the conflict of interest with plaintiff and allow him the option of alternate representation. The record is devoid of any evidence of either, as it is clear that a conflict of interest existed, and Local 1814's response was a blatant refusal to provide fair representation for plaintiff.

As if Local 1814's behavior was not egregious enough, Local 1814 not only failed to provide plaintiff any representation, but completely undermined plaintiff and colluded with management to permanently ban plaintiff from ASI.  In every respect, therefore, Local 1814 was in violation of their duty of fair representation to Mr. Sabella.

[14]

Pernice's admissions, with respect to Local 1814's undermining of plaintiff's grievance, were startling. Pernice's actions cannot be reconciled in any way with any claim that he provided fair representation to plaintiff.  At trial, Pernice was questioned about the potential conflict of interest related to his representation of plaintiff after plaintiff filed an EEOC Charge of discrimination against the union.  Pernice admitted that the way he handled that conflict was by determining that plaintiff *should be suspended.*

How can Local 1814 legitimately argue that they provided fair representation to plaintiff, when they themselves determined that plaintiff should be suspended? Consider Pernice's testimony:

Q.          Did you get your own member suspended at the pier level hearing?...

Q.          Let me refresh your memory.

On page 76, line 1, the question to you was: "Now. Let's try to get an answer to the question that you feel is confusing.  The question is how did you resolve the conflict at the pier level meeting?"

"Answer: How did I resolve it?  **That the individual should be suspended.  That's how I resolved it.**" (emphasis added)

Was that your testimony?

PERNICE.    Is that what it reads?

Q.          That's what it reads.

PERNICE.    Yes.

Q.          Do you want to take a look at it –

PERNICE.    No.

Q.          -- to make sure?

[15]

PERNICE.    No. (Exhibit E, 11/18/14, pp241-242:7-12)

No reasonable inference of fair representation whatsoever could exist, given Local 1814's lack of action on behalf of plaintiff, plus its clear bias against him. Pernice, himself, admitted that he determined that plaintiff should be suspended. Further, not only did Pernice determine that his own union member should be suspended, but Pernice also *colluded with management* to make sure that plaintiff was banned permanently from ASI. Pernice admitted as much:

> Q.        But you testified to the best of your recollection about how the Feliu and the McCausland report were treated at the pier level meeting regarding Sabella's grievance?
>
> PERNICE.    After we've had the opportunity to read.
>
> Now, I don't know if the meeting was convened or held afterwards. I'm not sure, but after we did read the report, okay, a decision was made to upheld the findings by the Feliu report and that's one of the - - one of the meetings we had that we agreed with the report on the basis suspension, on his decision for suspension.
>
> Q.        And when you say "we agreed", who do you mean by "we"?
>
> PERNICE.    We, both management and union who attended that meeting, and the labor adjusters, I should say. (Exhibit E, pp251-252:23-10)

Local 1814's defense cannot be so simple as to merely hide behind the Feliu report. Nowhere in the record is it even suggested that Pernice had to rely on the Feliu report. In fact, it is Pernice's duty, as plaintiff's representative, to question such a report against plaintiff, to determine whether the information and findings in the report have a reasonable basis, and to make some kind of effort to provide a defense to it on behalf of

[16]

plaintiff or argue for a less severe penalty. Pernice, and Local 1814, did none of this, and merely colluded *with management* to have plaintiff banned. As Pernice's own testimony reveals, this is likely because of a conflict between plaintiff and Local 1814, and Pernice's response to such conflict was that, "The individual (plaintiff) should be suspended." (Exhibit E, pp241-242:7-12)

This is not a matter of mere negligence or incompetence on the union's behalf. Local 1814 failed to conduct its own investigation, failed to represent plaintiff during the Feliu investigation, failed to critically analyze the Feliu report, failed to gather any witnesses and evidence to present on plaintiff's behalf (though such witnesses and evidence existed), failed to meet with plaintiff at any time prior to the Pier Level meeting to prepare for the hearing, failed to make any arguments on plaintiff's behalf during the meeting, forced plaintiff to 'sit down' and 'shut up' when he tried to defend himself at the hearing, determined that their own member should be suspended, and colluded with management to have plaintiff suspended.

Given the above, there exists, "an overwhelming amount of evidence in the favor of the movant," that judgment as a matter of law should be granted. *See Diesel*, 232 F.3d at 103. With respect to the Duty of Fair Representation claim against the union, a 'reasonable jury would not have a legally sufficient evidentiary basis to find in favor of the non-movant' union. *See DePascale*, 710 F. Supp. 2d at 279 (E.D.N.Y. 2010)) Pernice, and Local 1814, must be held accountable for failing to provide any representation to plaintiff, and for conspiring with ASI to have plaintiff permanently suspended. Therefore, judgment as a matter of law should be granted with respect to plaintiff's Duty of Fair Representation claim against Local 1814.

### 3. The Overwhelming Evidence Elicited at Trial Demonstrates that the Union's Breach of Duty Caused Sabella to Suffer Economic Loss of $114,000, or No Less Than $24,000

As per stipulation among the parties at trial, should plaintiff prove that defendant ASI retaliated against plaintiff and/or that defendant Local 1814 breached their duty of fair representation as to plaintiff, economic damages will be determined as follows:

- $0, if plaintiff proves that he suffered damages and defendant(s) prove that plaintiff failed completely to mitigate his damages;

- $24,000, if plaintiff proved that he suffered damages and defendant(s) prove that plaintiff partially mitigated his damages; or,

- $114,000, if plaintiff proved that he suffered damages and defendant(s) fail to prove that plaintiff did not mitigate his damages.

As Local 1814 breached its duty of fair representation, and defendant mitigated his damages, plaintiff is owed damages, including back pay, for such breach.

### a. Plaintiff Immediately Suffered Damages, and Immediately Took Steps to Mitigate his Damages

Subsequent to his retaliatory termination from ASI, plaintiff immediately suffered damages, and took immediate steps to mitigate his damages. Within days of being suspended from ASI on November 17, 2006, plaintiff began working for New York Container Terminal ("NYCT"). Defendant Union Exhibit 19C (Exhibit G)[7] proves this.

---

[7] For all citations to Exhibit G, please see Sabella's yearly payroll records as maintained by NYSA, attached to the Affirmation of Matthew J. Blit as Exhibit G.

As per week ending 11/19/06, plaintiff began working for NYCT. (Exhibit G, pages 'NYSA RESPONSE 372-390') However, while plaintiff worked at NYCT, he was not being given full-time work.   Notably, plaintiff regularly worked full-time and overtime while with ASI.  Accordingly, plaintiff's income suffered greatly immediately following his exit from defendant ASI.

This is evident from Mr. Sabella's payroll records, which were provided by defendant Local 1814 at trial.  As an example, in the week of his separation from ASI in November 19, 2006, plaintiff worked a total of 47.5 hours, with the majority of work coming from ASI. (Exhibit G, pages 'NYSA RESPONSE 372, 373, 375') Two weeks prior to his separation from ASI, plaintiff worked 56 hours at ASI. (*Id.*, 375)  Four weeks prior to his separation from ASI, plaintiff worked a total of 49.5 hours, again with the majority of work coming from ASI. (*Id.*, 373-375)  Five weeks prior to his separation from ASI, plaintiff worked a total of 53 hours. (*Id.*, 373, 375)  Finally, six weeks prior to his separation from ASI, week ending 10/15/06, plaintiff worked a total of 60 hours. (*Id.*, 374- 375)  In these five work weeks *prior to his separation* from ASI, plaintiff averaged 53.2 hours per week, due to the consistent work that he received from ASI.

This steady workload was due to the fact that ASI was plaintiff's home port, and he was on the "list", which guaranteed him work before other longshoremen:

Q.          What impact did you – did your suspension from ASI have on your ability to get steady work as a longshoreman?

SABELLA.          When you're a longshoreman on a steady pier, you basically know you're going to work every day unless there's no work, but if you're steady on the pier and your seniority brings you there, you know you're going to work.

[19]

So when I got suspended from American Stevedoring…you have to call for orders and you got to hope that the pier's short – the industry is short, so that your seniority can get you work the next day…

You know, it's not – you no longer have a steady job.  You have to hope that you get a job the next day. (Exhibit F., 11/12/14, p12:1-14)

When plaintiff lost his position with ASI, he lost his 'home pier' and, thereby, his seniority.

Q.          After you were banned from the company, were you on any other pier list?

SABELLA.    No.  After I was banned from American Stevedoring, I became basically what they call a floater.  It's like you don't have a pier.

Q.          …Did you ever get onto a pier list again since ASI?

SABELLA.    Yeah, in 2010, I believe. (Exhibit F., 11/12/14, p21:6-13)

Immediately after his separation from ASI, the amount of work that plaintiff received plummeted, though he clearly searched for work as evident by the fact that he continued to work.   Therefore, plaintiff's economic loss began from the very first week that he left ASI.

For week ending 11/24/06, the first full week after his separation from ASI, plaintiff worked 42 hours. (Exhibit G, pages 'NYSA RESPONSE 372')  For week ending 12/3/06, the second full week after his separation from ASI, plaintiff worked 32.5 hours. (*Id.*)  For week ending 12/10/06, the third full week after his separation from ASI, plaintiff worked 30 hours. (*Id.*)  For week ending 12/17/06, the fourth full week after his separation from ASI, plaintiff worked 23 hours. (*Id.*)  Finally, for week ending 12/24/06, the fifth full week after his separation from ASI, plaintiff worked 25 hours. (*Id.*)

[20]

Therefore, in the five full work weeks after plaintiff's separation from ASI, plaintiff worked an average of <u>30.5 hours per week</u>.

Plaintiff's economic loss immediately upon his separation from ASI, therefore, is indisputable.  As per the above, in the five weeks in which plaintiff worked *prior to* leaving ASI, plaintiff averaged 53.2 hours of work per week.  In the five weeks in which plaintiff worked *immediately after* his separation from ASI, plaintiff averaged only 30.5 hours of work per week.  Plaintiff's economic loss due to his retaliatory termination from ASI and Local 1814's failure to provide fair representation was, therefore, immediate and significant.  Though plaintiff mitigated his damages by finding work after ASI, he certainly suffered damages from the moment of his separation.

### b.   Plaintiff's Separation from NYCT Was Not For Cause, and Was Against the Industry's Collective Bargaining Agreement

Plaintiff separated from NYCT in or around January 7, 2007.  Plaintiff continued to suffer damages *attributable to defendants* after his separation from NYCT, as well.

Plaintiff lost his employment at NYCT through no fault of his own.  Courts have ruled that if a plaintiff gains subsequent employment after separation from a defendant, plaintiff *has not failed to mitigate damages* against defendant if he lost the subsequent employment through no fault of his own. *See Thurman v. Yellow Freight Systems, Inc.*, 90 F.3d 1160, 1168 (plaintiff fired from subsequent job for accident did not fail to mitigate damages because conduct was not willful or egregious), *amended*, 97 F.3d 833 (6th Cir. 1996))

Plaintiff's work with NYCT came to an end in January of 2007 (Exhibit F, p79:2-3) unjustifiably and without cause, as his separation from NYCT was against the union

[21]

contract and was not reasonable based on disciplinary action doled out to other NYCT employees.  As his separation from NYCT was against the union contract, it was certainly not foreseeable by plaintiff that he would lose his employment at NYCT due to his wholly justifiable actions.  Therefore, plaintiff's mitigation efforts did not cease at NYCT.

This is indisputable for the following reasons.  First, NYCT's stated reason for banning plaintiff was that he left work early, thus receiving a 'left work' or 'D' debit. Agosta, defendant Local 1814's very own witness, testified that one 'left work' debit cannot lead to termination.  In fact, it is only after ten (10) such debits that a longshoreman is called in front of the Waterfront Commission to explain such debits:

| | |
|---|---|
| Q. | Okay.  So what happens during that time frame, that specific time frame, what happens when an employee gets a D debit for leaving work early? |
| Agosta. | You get one debit, nothing happens at that point. (emphasis added) (Exhibit E, 11/18/14, p352:21-25) |

In fact, it takes up to ten (10) separate debits to even have to account for the accumulation of such debits:

| | |
|---|---|
| Q. | What about the tenth one? |
| Agosta. | You're called for a hearing. |
| Q. | So you're allowed ten D debits? |
| Agosta. | You're allowed ten C debits or D debits before you would be called to a hearing, you would be called to the absentee committee. (Exhibit E, 11/18/14, p353:16-21) |

[22]

Further,

> Q.          If an employer fires an employee for their first D debit, that's
>             unjustified, correct?
>
> Agosta.     I don't know anyone who was fired for one D debit. (Exhibit E,
>             p354:6-8)

Agosta, Local 1814's very own witness, confirms that plaintiff's one D debit at

NYCT certainly does not justify termination.  Indisputably, plaintiff's separation from

NYCT was not justified, as no other longshoreman would be terminated for one 'left

work' debit.  Plaintiff, therefore, satisfied his duty to mitigate despite the termination by

NYCT.

### c.    Plaintiff Further Mitigated his Damages By Calling In for Work  Hundreds of Times in Which He Was Not Offered Any Work

Finally, besides searching for and finding work immediately after his separation

from ASI, though suffering damages regardless, plaintiff made himself available for

industry work hundreds of days in which he was not offered any such work.  This is

further evidence of plaintiff's mitigation efforts and economic loss.

Local 1814 witness Agosta testified that an 'S Debit', as reflected on plaintiff's

payroll records, indicates that plaintiff made himself available for work as per industry

policy and practice, but wasn't called for a job.

> Q.          I'd like to direct your attention to S, "Code S available – not
>             offered work." What does that mean…

[23]

AGOSTA.     That means he called for orders.  He was in the shape in the morning and he - - he didn't have any work, they didn't call him for a job.

Q.          So that means he wanted to work that day, but there was nothing available for him?

AGOSTA.     Correct, and he was in the shape.  He called up the prior day.
            (Exhibit E, 11/18/14, pp346-347:19-9)

Defendant Union's Exhibit 19A confirmed that an 'S' code in plaintiff's payroll records

confirmed that plaintiff made himself available for work but wasn't given any. (Exhibit

H)[8]

Agosta acknowledged that between the period of 10/1/06 through 9/30/07,

plaintiff's payroll records reflect that plaintiff had fifty-three (53) 'S' debits, meaning that

plaintiff made himself available for work within the industry, but was not offered any.

(Exhibit E., 11/18/14, p348:19)  This encompassed the first year after the plaintiff lost his

employment with ASI. (Exhibit E, 11/18/14, p348:10-19) (Def. Union Exhibit 20,

'NYSA RESPONSE 164')

Agosta further acknowledged that between the period of 10/1/08 through 9/30/09,

plaintiff's payroll records reflect that plaintiff had eighty-six (86) 'S' debits, meaning

that plaintiff made himself available for work within the industry, but was not offered

any.  (Exhibit E, 11/18/14, p349:2-7) (Exhibit I, 'NYSA RESPONSE 168')[9]

Agosta further acknowledged that between the period of 10/1/09 through 9/30/10,

plaintiff's payroll records reflect that plaintiff had one hundred and twenty eight (128) 'S'

debits, meaning that plaintiff made himself available for work within the industry for

---

[8] For all citations to Exhibit H please see Sabella's NYSA Employee Codes, attached to the Affirmation of Matthew J. Blit as Exhibit H.
[9] For all citations to Exhibit I, please see Sabella's employe attendance records as maintained by NYSA, attached to the Affirmation of Matthew J. Blit as Exhibit I.

those amount of days, but was not offered any.  (Exhibit E, 11/18/14, p349:8-11) (Exhibit I, 'NYSA RESPONSE 170')

Finally, Agosta acknowledged that between the period of 10/1/10 through 9/30/11, plaintiff's payroll records reflect that plaintiff had <u>seventy-seven (77)</u> 'S' debits, meaning that plaintiff made himself available for work within the industry for those amount of days, but was not offered any.  (Exhibit E, 11/18/14, p349:2-7) (Exhibit I, 'NYSA RESPONSE 172')

Therefore, in the four years subsequent to plaintiff's separation from ASI, excluding the year in which plaintiff largely collected Workers' Compensation due to injury, plaintiff made himself available for work, but was not offered any, three-hundred-and-forty-four (344) times.  Plaintiff certainly made efforts to mitigate his damages, but did not receive work through no fault of his own.

Due to the above, it is evident that plaintiff suffered significant economic loss due to defendant's actions, and attempted to mitigate such loss.  Therefore, plaintiff respectfully requests that this Court grant plaintiff judgment for damages against defendant Local 1814 in an amount of $114,000, or no less than $24,000.

### 4.   Alternatively, or Conditionally, the Court Should Order a New Trial Pursuant to F.R.C.P. Rules 50(b), 50(c) and 59

#### a.   Legal Standard for Granting a New Trial

"[A] new trial is properly granted, pursuant to Rule 59 of the Federal Rules of Civil Procedure only if the verdict is so against the weight of the evidence as to constitute a 'seriously erroneous result,' or 'a miscarriage of justice.'" *DePascale*, 710 F. Supp. 2d at 285 (citing *Farrior v. Waterford Bd. of Educ.*, 277 F.3d 633, 635 (2d Cir. 2002)).  "As

the standard implies, a court deciding a Rule 59 motion may weigh the evidence introduced at trial, and additionally, is not required to view the evidence in the light most favorable to the non-moving party." *DePascale*, 710 F. Supp. 2d at 285 (citing *Farrior*, 277 F.3d at 635)). Although a jury verdict should rarely be disturbed, a court should order a new trial when the weight of the evidence is so great that the court concludes that a seriously erroneous result was reached or that a miscarriage of justice occurred. *DePascale*, 710 F. Supp. 2d at 285.

Further, "[i]f the court grants a renewed motion for judgment as a matter of law, it must also conditionally rule on any motion for a new trial by determining whether a new trial should be granted if the judgment is later vacated or reversed." F.R.C.P. Rule 50(c)(1).

> **b.      The Jury's Finding against Sabella on the Duty of Fair Representation Claim Was against the Weight of the Evidence**

To eliminate redundancy, plaintiff respectfully directs the Court to Section 4(A)(2), *supra*, which illustrates that at the very least a new trial should be granted with respect to plaintiff's claim that defendant Local 1814 breached its duty to fairly represent plaintiff.

## V.      CONCLUSION

For the reasons stated herein, plaintiff respectfully requests that the Court grant Judgment, pursuant to Rule 50, on liability and damages against defendant Local 1814, due to Local 1814's breach of its duty to fairly represent plaintiff.

Dated: December 17, 2014
New York, New York

LEVINE & BLIT, PLLC

_____

MATTHEW J. BLIT, ESQ.

*Attorneys for Plaintiff*
Empire State Building
350 Fifth Avenue, 36th Floor
New York, NY 10118
Phone: (212)967-3000
Fax: (212)967-3010

[27]